Filed 7/1/26  In re A.G. CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| In re A.G., a Person Coming Under the Juvenile Court Law. | C103411 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>V.G.,<br>　　Defendant and Appellant. | (Super. Ct. No. JD000199) |

V.G. (mother), the mother of minor A.G., appeals the juvenile court's findings and orders at the 12-month review hearing.  Mother contends that:  (1) the juvenile court violated her due process and other constitutional rights by appointing a guardian ad litem in her absence; (2) the court's jurisdictional and dispositional findings are not supported by substantial evidence; (3) there was insufficient evidence to show that returning A.G. to her care would create a substantial risk of harm; and (4) the court erred in finding that the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related state law (Welf. & Inst. Code, § 224.2) did not apply.[1]  We reject mother's contentions and affirm.

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

BACKGROUND

I.

In December 2023, the Solano County Health and Human Services Department (Solano Department) filed a dependency petition on behalf of three-day-old A.G., alleging a failure to protect (§ 300, subd. (b)(1)) and failure to provide support (§ 300, subd. (g)). The petition alleged that mother was suffering from mental illnesses that impaired her ability to adequately care for and supervise A.G. Mother was diagnosed with posttraumatic stress disorder with disassociated symptoms, borderline personality disorder, and schizoaffective disorder; was not receiving medication; exhibited agitation and heightened paranoia when A.G. was born; and was homeless with no plan for stable housing. Mother also refused to provide information regarding A.G.'s father. The petition alleged that, in light of these circumstances, A.G. was at substantial risk of harm, abuse, or neglect. An ICWA-010 form attached to the petition said that mother gave the social worker no reason to believe A.G. was an Indian child.

Mother has four other children (the half siblings), three of whom were the subject of a 2009 dependency petition in Yolo County based on mother's alleged failure to protect the children from domestic violence, to provide adequate shelter and safety, and to seek appropriate medical care for them. Following reunification services in that case, the juvenile court terminated dependency jurisdiction in April 2011 and returned the children home. The half siblings currently reside with their father, who wanted no contact with A.G. because one of the half siblings had witnessed mother experiencing a mental health crisis that upset the child.

The Solano Department's initial detention report recommended that A.G. be detained because he was at substantial risk of serious physical harm or illness in mother's care and reasonable efforts to prevent removal were not effective in eliminating the need to remove him. Due to mother's lack of provisions, lack of housing, and history of

2

mental health issues, the Solano Department believed that mother was unable to adequately and safely care for A.G.

According to the report, mother was evasive with hospital staff and repeatedly refused to disclose information about her living situation or A.G.'s father (who supposedly lived in Louisiana and spoke with mother at some point during her hospital stay). Mother reported no known Native American ancestry to the social worker but refused to provide any relative information.

Mother had an extensive history of prior psychiatric holds, including some while pregnant with A.G. She stopped taking her medication while pregnant and wanted to use coping mechanisms to manage her symptoms rather than resume medication. She said she was willing to restart medication if her counselor, whom she did not identify, recommended it. Mother had a backpack with minimal baby supplies, including a few outfits, blankets, wipes, diapers, bottles, and formula. She stated that she did not have money to buy other items, but said that a brother-in-law was buying her a car seat and her mother was sending a bassinet from Los Angeles.

Mother's friend Michael L. called the social worker and reported that mother could not return to her former home due to a dispute with the owner's son. He knew someone willing to let mother stay at a short-term rental for a week, but Michael was not willing or able to provide mother housing. Michael did not have any information about A.G.'s father or other family members.

Maternal step-grandmother, Angela G., told the social worker that mother had struggled with her mental health since high school, is not stable, is difficult to communicate with, and is often on the street. She and her husband (maternal grandfather) had guardianship of mother's other four children until February 2023, when their biological father gained custody; mother had minimal contact with A.G.'s half siblings while they lived with the grandparents. The maternal step-grandmother declined placement of A.G. because mother was too " 'unpredictable,' " given her mental health

3

issues.  Maternal step-grandmother did not have contact information for A.G.'s alleged father (who, mother had told her, lived in Mississippi and was serving time for child molestation) or any other family members.

On December 11, 2023, mother attended the detention hearing with Michael as her support person.  During the hearing, mother's appointed counsel told the juvenile court that mother denied knowing who A.G.'s father was, said that the man from Louisiana was not A.G.'s father based on timing and resemblance issues, and claimed that another man, possibly named Chris, might be the father, although she provided no last name or contact information for that individual.

Mother submitted a Parental Notification of Indian Status form (ICWA-020) indicating no Native American ancestry.  Her counsel explained, however, that mother was looking into the issue further because she was unsure of her maternal heritage.  The Solano Department continued to inquire about A.G.'s relatives and ICWA issues.

The Solano County juvenile court detained A.G. in foster care, set the jurisdictional and dispositional hearing for February 1, 2024, and ordered the Solano Department to complete further ICWA inquiry.  The court ordered visitation, parenting education, and a mental health assessment for mother pending further proceedings.  That same day, mother filed an address notification form listing a P.O. Box in Elmira as her mailing address.

II.

In January 2024, the Solano Department filed its jurisdictional/dispositional report.  The report recommended that the juvenile court sustain the petition, find that ICWA may apply, and order reunification services for mother but not the unknown alleged father.  The report noted that mother exhibited paranoia and refused to answer questions about the case without her attorney present.  She was not taking medication, had not addressed her serious mental health symptoms, and was unaware how her untreated mental health issues affected her ability to safely parent A.G.

4

The Solano Department determined that A.G. would "not be safe in the care of mother," given her ongoing and untreated mental health issues. The department assessed the risk of child abuse or neglect as "[v]ery [h]igh." The initial proposed case plan included mother obtaining a suitable residence, completing a psychotropic medication evaluation, and participating in mental health treatment, counseling, parenting classes, and twice-weekly visits.

In a January 2024 ICWA and relative compliance report, the Solano Department recommended that the juvenile court find that it had satisfied its notice obligations and that ICWA may apply. According to this report, the department sent written ICWA-030 notices to the Bureau of Indian Affairs (BIA), the Colorado River Indian Tribes, and the Navajo Nation based on mother's prior report during the 2009 dependency proceeding involving A.G.'s half siblings that she may have Navajo ancestry through the maternal grandmother. The ICWA-030 form listed A.G.'s last name and date of birth in addition to the names, dates of birth, and possible tribal affiliations for mother and the maternal grandmother (mother's biological mother) as well as the maternal grandmother's address. The department submitted certified mail receipts to the court. The ICWA report also included a maternal family chart that listed mother's name, date of birth, and phone number as well as her father's name (maternal grandfather) and his phone number, which was no longer in service. Mother refused to provide further information regarding Native American ancestry or additional relatives, and the Solano Department referred the matter to an outside agency for family finding services. The identity of the alleged father and any paternal relatives remained unknown.

Mother initially appeared remotely for the uncontested jurisdictional/dispositional hearing on February 1, 2024, but was not present when the juvenile court called the case. Her counsel alluded to possible "technical difficulties" but did not further elaborate. Mother's counsel informed the court that she had reviewed the dependency reports with mother, and counsel requested a continuance to facilitate further settlement discussions

5

with the Solano Department. Regarding ICWA, the Solano Department reported that it was awaiting responses from the tribes. The court continued the uncontested jurisdictional/dispositional hearing to February 29, 2024.

Prior to the continued hearing, the Solano Department filed an amended ICWA and relative compliance report updating the juvenile court on its further ICWA inquiry. This report explained that the department had sent certified letters, called, and e-mailed the Navajo Nation and Colorado River Indian Tribes, but had not received a response from either tribe. The Solano Department again recommended that the court find that it met its notice requirements and that ICWA may apply.

Mother did not attend the uncontested jurisdictional/dispositional hearing on February 29, 2024. When the hearing began, mother's counsel told the juvenile court that she had informed county counsel of mother's request for transportation and believed the request was conveyed to the social worker. Counsel stated that "mother indicates that nobody reached out to her for a ride to arrange for transportation to her." County counsel stated that she had forwarded the transportation request to the Solano Department; the social worker had responded and said she would attempt to reach out to mother to provide transportation. Mother's counsel also confirmed that she provided mother with the remote access link to appear and participate in the hearing remotely.

During the hearing, mother's counsel requested a guardian ad litem for mother. The proposed guardian ad litem was also present and participated in the hearing. Mother's counsel explained that, based on her in-person meeting with mother as well as multiple phone conversations, she believed mother was unable to assist her during the dependency proceedings. Counsel discussed appointing a guardian ad litem with mother prior to the hearing, and "[t]his was not the first time that [counsel] mentioned appointing a guardian for her." Counsel specifically informed mother that she intended to request a guardian ad litem for mother at the February 29 hearing. Counsel told mother that if she objected, mother had to appear remotely to contest the appointment or at least let counsel

6

know she objected so counsel could put the matter on calendar for a separate hearing for mother to explain why a guardian ad litem was unnecessary. Counsel arranged for mother to meet with her and the proposed guardian ad litem prior to the February 29 hearing, but they waited almost an hour and mother failed to show.

Mother's counsel also explained that she spent several hours going over the jurisdictional/dispositional report with mother. Counsel reviewed a county questionnaire with her as well, but mother had not yet returned it to counsel. Mother continued to refuse to provide information about A.G.'s father. In the meantime, mother's counsel and county counsel worked on proposed amendments to the petition allegations to remove the allegation that mother was homeless. Mother's counsel discussed the proposed amendments with mother, and mother "was agreeable to th[em]."

The proposed petition amendments to which mother was "agreeable" alleged that: mother had mental health and/or psychiatric concerns that impaired her judgment and ability to provide adequate care and supervision of A.G.; she was diagnosed with several psychiatric disorders and exhibited symptoms of those disorders while in the hospital after A.G.'s birth, including agitation and heightened paranoia; she was not prescribed psychotropic medications; and her active and untreated mental health issues placed A.G. at substantial risk of physical harm or illness. (§ 300, subd. (b)(1).) The lack of support allegations regarding the unknown alleged father's whereabouts and mother's refusal to provide information about him remained the same. (§ 300, subd. (g).)

Based on the amended petition, mother's counsel stipulated to jurisdiction and disposition and asked the juvenile court to include housing services in mother's case plan because she was currently moving from house to house with various individuals. The guardian ad litem informed the court that she was verbally advised of the detention report, reviewed the jurisdictional/dispositional report, and was aware of the parties' negotiated petition amendments. She approved of submitting on jurisdiction and disposition given the proposed amendments.

7

After finding that mother's counsel had discussed jurisdiction, disposition, and the amended petition allegations with mother, the juvenile court appointed the guardian ad litem and accepted the guardian's signed waiver of rights on mother's behalf to submit on the amended petition on the department's reports without a contested hearing. The court sustained the petition as amended, adjudged A.G. a dependent under section 300, subdivisions (b) and (g), continued to detain A.G. from mother's custody, and found that ICWA may apply. The court also ordered reunification services for mother but not the unknown father and set a six-month status review hearing for August 2024. The Solano Department asked the court to remove mother's medical authority in light of the guardian ad litem's appointment. Both mother's counsel and the guardian ad litem objected, and the court denied the request.

The juvenile court's written findings and orders on jurisdiction (Form JV-412) and disposition (Form JV-415) were served on mother's counsel. The written dispositional order included an express advisement regarding the right to appeal the court's orders. Mother did not appeal the dispositional order or jurisdictional findings.

III.

In August 2024, the Solano Department filed two status review reports recommending that A.G. remain in foster care and mother continue to receive reunification services. According to the reports, mother refused to disclose her current address before speaking to her attorney; she said she was homeless and staying with friends. Although ICWA inquiries were ongoing, the Solano Department had received no new information to warrant changing the juvenile court's previous ICWA finding.[2] No

---

[2]  Both status review reports stated that the juvenile court made a finding on February 29, 2024 that "ICWA does not apply." However, at the February 29 combined jurisdictional/dispositional hearing, the juvenile court found that ICWA may apply.

8

new relative information was received, and mother declined to share any contact information for other family members.

The status reports noted that mother had difficulty recognizing A.G.'s cues during visits and often asked the visit supervisor for assistance. Mother struggled to determine if A.G. was crying due to hunger, tiredness, or needing a diaper change and had difficulty retaining information. A.G.'s caregiver also reported ongoing concerns with mother's ability to safely parent A.G. Mother demanded that seven-month-old A.G. reach for her before she would take him from the caregiver and said his actions of not immediately going to her hurt her feelings. Mother filmed A.G. crying during a visit, commenting that he was cute when he cried. Another time, mother said that they should take his toy away to see if he cries and that " 'he need[ed] to learn a lesson.' " Mother called A.G. conceited and said he was " 'too into himself because he saw his reflection in the window and smiled.' " Although the caregiver explained this was a natural part of an infant's development, mother said A.G. better not be " 'cocky and rude.' " Mother sometimes brought individuals with mental health issues with her to visits or meetings, associated with people she said harmed her, and was banned from several establishments in the area due to her mental health breakdowns and behavioral issues. The caregiver found mother's "behavior deeply concerning."

On August 8, 2024, mother attended the six-month review hearing with her counsel and the guardian ad litem. Counsel requested to continue the matter because mother wanted the case transferred to Sacramento County, where she lived. According to counsel, mother agreed to participate in the psychological evaluation included in her case plan, but wanted her own service providers to conduct the evaluation; mother was amenable to the social worker's supervisor attending one of her therapy appointments, although she still had not executed a release of information. Mother completed two parenting classes and attended some therapy and psychiatry appointments, and she requested the Solano Department increase her visitation.

9

The guardian ad litem asked the juvenile court to continue the matter to assess mother's transfer request. Regarding paternity, the guardian ad litem stated that A.G.'s conception may have involved a criminal act and requested that mother be allowed to explore the issue with her therapist before providing further information as to the alleged father's identity. Mother's counsel continued to assert that mother did not have a name for the father.

The juvenile court continued the matter as requested. Mother's counsel confirmed mother's address in Sacramento for verification.

At the continued status review hearing on September 5, 2024 (§ 366.21, subd. (e)), mother's counsel noted that mother was present earlier but was no longer there. Mother's counsel and the guardian ad litem requested that the juvenile court set the matter contested in October.

Prior to the contested six-month review hearing, mother filed a pro per declaration with several letters, text messages, and parenting class certificates for the juvenile court's consideration. In one letter, mother claimed that A.G.'s caregiver and the social worker defamed her and harassed her to give A.G. up for adoption. A letter from James W. said he attended two meetings with mother during which the social worker was condescending to mother and did not protect her privacy. A letter from Spencer S. claimed that the social worker visited their home and demanded information from them instead of merely verifying their residence.

In mother's second letter, she explained the circumstances of A.G.'s birth and said she had been staying with a friend and was fearful of anyone coming to harm her or A.G. She claimed to have obtained a restraining order against "a lady … [who] works with certain individuals in law enforcement." Mother said that she was "stalked, abused, harassed, threatened, and even falsely arrested in the past" and asserted that officers used excessive force when removing A.G. from her at the hospital.

10

The juvenile court held the contested six-month review hearing on November 4, 2024. The court reviewed and considered mother's declaration and its attachments, the February 2024 amended ICWA report, and both status review reports. During the hearing, the court and the guardian ad litem addressed mother's transfer request in detail and, after an extensive discussion explaining the process to mother and cautioning her of the possibility of delay in services pending transfer, mother, with the guardian ad litem's consent, agreed to waive any reasonable services objection between the time of transfer and a return to Solano County if Sacramento County declined to accept the transfer. The court commented that mother appeared to have a hard time understanding the transfer process.

The juvenile court granted mother's request to transfer the case to Sacramento County and continued reunification services for an additional six months. Because more than 60 days had elapsed since the Solano Department contacted the noticed tribes and neither tribe had responded, the court also found the department made active inquiries to obtain information about, and exercised due diligence regarding, A.G.'s Native American ancestry. The court determined that ICWA did not apply.

Mother's updated case plan included obtaining stable and suitable housing, treating her diagnosed mental health disorders, and participating in counseling and parenting classes. The case plan noted that mother failed to disclose her address or follow up on housing resources provided to her; she also failed to comply with mental health treatment, provided no contact information for a therapist she said she was seeing, and had not signed a release of information. Mother was ordered to complete a psychiatric/psychological evaluation to determine her current mental health diagnoses and whether medication was needed; she was also ordered to complete parenting classes because both the caregiver and the visitation supervisor reported that mother lacked insight into A.G.'s infant cues.

11

IV.

The initial transfer-in hearing occurred in Sacramento County juvenile court on November 18, 2024. Mother appeared remotely with newly appointed counsel. The court ordered the Sacramento County Department of Child, Family, and Adult Services (Sacramento Department) to complete a transfer-in report.

During the hearing, the juvenile court asked mother about possible Native American ancestry, and mother said an uncle or her father's cousin once told her she had some Native American ancestry, possibly Navajo, but she did not know the specific tribe. She provided her father's name, said he lived in Elk Grove, and believed the other relative might be named Richard, although she was not sure. The court set the matter for a further transfer-in and ICWA compliance hearing in December 2024.

After visiting the Sacramento residence where mother said she rented a room, the Sacramento Department recommended that the Sacramento juvenile court accept the transfer from Solano County. The report documented the Solano social worker's concerns that mother did not actually live in the residence, that she failed to provide evidence she was receiving mental health treatment or medication, and that she never followed through on a mental health assessment or psychological evaluation. Concerns about mother's behavior during visits were also noted.

The Sacramento Department filed an ICWA compliance report on December 10, 2024, recommending that the juvenile court find ICWA did not apply. The report noted that, in the prior 2009 dependency case concerning A.G.'s half siblings, mother claimed potential Navajo heritage through the maternal grandmother and that after noticing was complete the court found ICWA did not apply, although it was unclear when the finding was made. The Sacramento Department sent ICWA inquiry letters to the maternal grandmother and maternal grandfather and made several attempts to contact the BIA and noticed tribes via telephone, fax, e-mail, or mail. The department had not received any

12

new or additional information that would warrant a change in the Solano juvenile court's prior finding that ICWA did not apply.

At the transfer-in hearing on December 16, 2024, mother personally appeared with appointed counsel. The Sacramento Department recommended that the juvenile court accept the case for transfer and order mother to complete a psychological evaluation. Because the department was still awaiting responses to the ICWA inquiry letters it sent to the maternal relatives, it requested that the court continue the ICWA determination.

Mother's counsel requested that mother's providers conduct the psychological evaluation and said mother was willing to execute a release of information to facilitate the social worker contacting her therapist. Counsel requested an increase in mother's weekly visitation.

The juvenile court accepted the transfer-in, ordered mother to participate in the psychological evaluation, and set a progress hearing for return on the psychological evaluation and ICWA in January 2025 (which was later continued because the psychological evaluation was not complete and no updated ICWA report was available). The court set the 12-month review hearing (§ 366.21, subd. (f)) for February 2025.

In January 2025, A.G.'s caretaker submitted a de facto parent request, noting that A.G. had lived with her for 14 months since his birth. The request described how she cared for him, their daily activities, and how A.G. relied on her for all his needs. The caretaker was willing to provide A.G. with a permanent home if reunification was not successful.

That same month, the Sacramento Department filed a second ICWA compliance report, explaining that it had received no response from the maternal grandmother or the maternal grandfather. Although the department sent updated family tree information to the Navajo Nation and the Colorado River Indian Tribes, and left detailed phone messages for each tribe, neither had responded. Mother was still unable to provide information about her family members or contact information for those she claimed

13

might have information concerning A.G.'s possible Native American ancestry. The Sacramento Department therefore recommended that the court find that it exercised due diligence in completing further inquiry under section 224.2, subdivision (e), that there was no reason to believe or reason to know A.G. was an Indian child, and that ICWA did not apply.

V.

The Sacramento Department filed its permanency review report on January 24, 2025. The report stated that ICWA did not apply and recommended that A.G. remain a dependent child in foster care and that mother continue to receive services. The Sacramento Department assessed the risk of returning A.G. to mother's care as high given her mental health and inability to remain medication-compliant for extended periods of time. No family member had come forward to be assessed for placement.

According to the report, although mother consistently visited with A.G., she continued to have trouble understanding A.G.'s behavioral cues and often sought assistance from the caregiver and visitation staff. Mother brought strangers to visits who often had to be escorted out due to their "outlandish" behavior. A.G.'s caregiver reported that he recently became clingy and inconsolable for several hours after visits with mother.

Mother expressed "ongoing feelings" about her safety but provided no supporting documentation and said she did not have a restraining order against the woman she feared was stalking her. Mother also talked about the caregiver and Solano County social workers being in a cult and trying to recruit A.G. into the cult. Mother said she had been staying in a bedroom in a Sacramento residence for several months, but when asked for proof of residency, mother said she had no mail with her name and address and did not pay rent or utilities. Mother did not have a job, was not enrolled in school, and said she received no services in Sacramento.

Mother's therapist reported that mother had not consistently met with her or taken her medication. Mother failed to timely respond to attempts to schedule a psychiatry

14

appointment and continued to exhibit distrust, paranoia, and dysregulation during therapy sessions and over the phone. Although mother had completed some parenting classes, she still struggled to demonstrate an understanding of age-appropriate behaviors and cues. The visit supervisor noted that mother presented with several mental health challenges during visits, her paranoia and anxiety fluctuated unpredictably, and she was often distracted and unable to calm A.G. when he frequently became upset during visits.

The combined progress and 12-month permanency review hearing occurred on February 3, 2025. The Sacramento Department asked the juvenile court to adopt its recommendations, set a progress hearing on the psychological evaluation and ICWA compliance, and set the 18-month permanency review hearing (§ 366.22). Mother's counsel objected to continued out-of-home placement, but submitted as to continued services.

The juvenile court adopted the Sacramento Department's proposed findings and orders, including that returning A.G. to mother's physical custody would create a substantial risk of detriment to his safety, protection, or physical or emotional well-being and that she had made minimal progress toward alleviating or mitigating the causes necessitating A.G.'s out-of-home placement. The court continued services for mother, set an ICWA compliance and progress report hearing in April 2025, and set the 18-month review hearing for June 2, 2025. The court granted the caregiver de facto parent status.

Mother filed a notice of appeal stating that she was challenging the de facto parent order entered at the 12-month review hearing on February 3, 2025. Because her opening brief challenges other aspects of the orders issued at the 12-month review hearing as well as the earlier order appointing a guardian ad litem, and respondent addressed the merits of those claims on appeal, we will construe the notice of appeal broadly to encompass all of the juvenile court's findings and orders entered on February 3, 2025 and the juvenile court's guardian ad litem order. (*In re J.F.* (2019) 39 Cal.App.5th 70, 75 ["A notice of appeal shall be ' "liberally construed so as to protect the right of appeal if it is *reasonably*

15

*clear* what [the] appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced" ' "]; *In re Enrique G.* (2006) 140 Cal.App.4th 676, 682-683 [permitting challenge to guardian ad litem order in appeal of subsequent appealable order].)

DISCUSSION

I.

Mother first challenges the juvenile court's order appointing the guardian ad litem.

A.

"In a dependency case, a parent who is mentally incompetent must appear through a guardian ad litem, to whom the parent yields management and control of the litigation." (*In re James F.* (2008) 42 Cal.4th 901, 904 (*James F.*); see also *In re Sara D.* (2001) 87 Cal.App.4th 661, 665-667 (*Sara D.*).) The test for mental incompetence is whether the parent has the capacity to understand the nature or consequences of the proceeding and assist counsel in preparing the case. (*James F.*, at p. 910.) If direction and control of the litigation are transferred from the parent to a guardian ad litem, the guardian may waive the parent's right to a contested hearing. (*Ibid.*)

Before appointing a guardian ad litem for a parent in a dependency proceeding, the juvenile court must hold an informal hearing to explain to the parent the purpose and powers of a guardian ad litem and the reasons for believing the parent is incompetent. (*James F.*, *supra*, 42 Cal.4th at pp. 904-905, 910-911; *Sara D.*, *supra*, 87 Cal.App.4th at pp. 663, 671-672.) If the parent does not consent to the appointment, the court must give the parent an opportunity to argue that a guardian ad litem is not required. (*James F.*, at pp. 905, 910-911; *Sara D.*, at pp. 663, 671-672.)

B.

Mother contends that the juvenile court violated her constitutional rights to due process, freedom of speech, and freedom from unreasonable seizures by appointing the

guardian ad litem without first conducting a hearing at which she had the opportunity to contest the need for a guardian. We perceive no prejudicial error on the record before us.

As noted above, the juvenile court addressed the issue of a guardian ad litem at the February 29, 2024 jurisdictional/dispositional hearing, which was originally scheduled for February 1. Mother concedes that she was present during the December 2023 detention hearing when the juvenile court set the initial jurisdictional/dispositional hearing for February 1. She therefore had actual notice of that hearing, regardless of whether, as her appellate briefs emphasize, the proofs of service for the hearing provided no address for mother other than "UNK UNK, Vacaville, CA" and no other contact location for receiving the notice. (See *In re Malcolm D.* (1996) 42 Cal.App.4th 904, 913 [parent's presence at dependency hearing gave him actual notice that the matter was continued and was sufficient to satisfy due process and to forestall a claim of lack of notice].)

Having received actual notice of the hearing, mother appeared remotely on February 1, but, for reasons that are not entirely clear from the record, failed to remain online until the juvenile court called the case. Her counsel requested a continuance to permit further settlement discussions between the parties, and the court continued the uncontested hearing to February 29, 2024.

While mother did not appear at the continued February 29 hearing, counsel stated she had conveyed mother's transportation request to the department. County counsel confirmed that she (county counsel) had contacted the social worker, who agreed to reach out to mother about transportation. But even assuming the social worker failed to attempt to contact mother prior to the hearing to arrange transportation, mother's counsel expressly notified mother of the continued hearing date and time and provided mother with an access link so she could attend the hearing remotely. Mother therefore had actual notice of the continued jurisdictional/dispositional hearing and had a remote access link

17

to participate in the continued hearing, notwithstanding any alleged lack of transportation.

Moreover, during the February 29 hearing, mother's counsel told the juvenile court that she discussed the need for a guardian ad litem with mother on multiple occasions. Counsel also specifically told mother that she intended to request a guardian ad litem at the February 29 hearing; counsel further informed mother that she needed to appear at the hearing using the remote access link if she wanted to object to the appointment request, or, at a minimum, she needed to let counsel know she objected so counsel could request a separate hearing for mother to explain to the court why a guardian ad litem was unnecessary. Mother's counsel also arranged a meeting between mother and the proposed guardian ad litem before the February 29 hearing, but mother failed to show without explanation after they waited nearly an hour. Given these circumstances, the record supports a conclusion that mother had actual notice of the initial and continued hearings, that her counsel explained the concept of a guardian ad litem to her and why it was necessary, that she knew her counsel intended to request the guardian ad litem at the continued hearing on February 29, and that she had an opportunity to attend or otherwise object to the appointment.

Further, nothing in the record supports mother's contention that the juvenile court appointed the guardian ad litem simply because she was "[b]eing difficult to deal with." Instead, as mother's counsel explained, based on multiple interactions with mother, counsel believed mother could not assist her during the case. This was a proper consideration in determining whether to appoint the guardian ad litem. (See *James F.*, *supra*, 42 Cal.4th at p. 910.) Moreover, ample evidence in the record shows that mother had a significant history of severe mental illness and exhibited untreated symptoms while in the hospital. She was not taking medication following A.G.'s birth and was unaware how her untreated mental health issues affected her functioning; the maternal step-grandmother described her as unstable and noted she had difficulty communicating with

18

others.  Mother had difficulties understanding the dependency process, even when the juvenile court and the guardian ad litem explained things to her in detail.  The court itself recognized that mother struggled with comprehending the transfer-out process and the risk that it would cause services to be delayed until the transfer was approved or rejected.

C.

Even if we assume there were procedural deficiencies in the appointment of the guardian ad litem, the error was harmless.  In *James F.*, our state supreme court held that an error in the procedure used to appoint a guardian ad litem in a dependency proceeding is subject to harmless error review.  (*James F.*, *supra*, 42 Cal.4th at pp. 904-905, 915.)  It is not "a structural defect requiring reversal of the juvenile court's orders without regard to prejudice."  (*Id.* at p. 915.)  The court in *James F.* declined to decide the applicable standard for measuring prejudice.  (*Id.* at p. 911, fn. 1.)  We will assume without deciding that the more exacting standard applicable to federal constitutional errors under *Chapman v. California* (1967) 386 U.S. 18, 24, which asks whether the error was harmless beyond a reasonable doubt, applies.  (See, e.g., *Sara D.*, *supra*, 87 Cal.App.4th at p. 673 [applying federal constitutional standard of harmless beyond a reasonable doubt].)

Here, mother argues that the defective appointment of a guardian ad litem prejudiced her because the guardian improperly waived her right to contest jurisdiction and disposition.  The record does not support this claim.  While the guardian ad litem did submit on the petition as amended at the continued hearing, mother's counsel spent several hours going over the jurisdictional/dispositional report with mother.  Based on their conversations, counsel negotiated proposed changes to the petition, including removing the allegations regarding homelessness.  And after discussing the proposed amendments with mother, counsel stated that mother was "agreeable" to the changes.  In other words, mother was amenable to submitting on the petition as amended, which is precisely what her counsel and the guardian ad litem did on her behalf.

19

Moreover, we see no likelihood of a different outcome if the guardian had not been appointed. (See *In re Esmeralda S.* (2008) 165 Cal.App.4th 84, 93-94 [prejudice analysis looks to whether procedurally defective appointment of guardian ad litem affected outcome of proceedings].) With respect to jurisdiction and disposition, on which mother focuses, the record shows that mother had previously lost custody of her older children and that the symptoms of her untreated mental illness, including heightened paranoia and agitation, impaired her judgment and understanding of A.G. and his needs and impeded her ability to provide safe and adequate care for him. (See *In re I.J.* (2013) 56 Cal.4th 766, 773.) Mother points to no evidence or argument that could have been offered in opposition to the department's petition at the jurisdictional/dispositional hearing had no guardian been appointed. Nor does mother offer any argument for why the outcome of the 12-month review hearing would have been any different. Indeed, by that point in the proceedings, mother did not have an appointed guardian.

For these reasons, this case differs from *Sara D.*, on which mother relies. In that case, unlike here, the parent's appointed counsel and guardian ad litem made strategic decisions to concede jurisdiction during the middle of a contested multi-day jurisdictional hearing that prevented the parent and several additional witnesses from testifying as scheduled. (*Sara D.*, *supra*, 87 Cal.App.4th at pp. 664-665, 673.)

Finally, in her reply brief, mother faults her trial counsel for pursuing a request for appointment of a guardian ad litem in mother's absence, asserting that the move reflected ineffective assistance of counsel that deprived mother of the procedural protections to which she was entitled. Because mother's claim of ineffective counsel was raised for the first time in reply, we need not address it. (See *Garcia v. McCutchen* (1997) 16 Cal.4th 469, 482, fn. 10.) Even if we were to consider the claim, it would fail for lack of prejudice, for the reasons we have explained.

## II.

Mother next argues that the juvenile court's jurisdictional findings and dispositional orders must be reversed. In her view, the court's findings based on her lack of housing and mental illness are per se reversible and unsupported by substantial evidence. We do not address these contentions, because the time to appeal from those orders has long passed.

Section 395 provides in relevant part that "[a] judgment in a proceeding under [s]ection 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment." (§ 395, subd. (a)(1).) In a dependency case, the dispositional order constitutes the judgment and generally must be appealed within 60 days after rendition. (*In re S.B.* (2009) 46 Cal.4th 529, 532; *In re Hunter W.* (2023) 88 Cal.App.5th 358, 368.) A consequence of section 395 is that an unappealed dispositional order is final and binding and may not be attacked on appeal from a later appealable order. (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018.) "An appeal from the most recent order in a dependency matter may not challenge earlier orders for which the time for filing an appeal has passed." (*Ibid.*)

Mother did not file a notice of appeal within the required 60-day period after the juvenile court entered the dispositional order on February 29, 2024. The court's written order, made on the standard Judicial Council form (JV-415) and served on her appointed counsel, contained information regarding the right to appeal the order. Having failed to timely appeal, mother cannot challenge the jurisdictional findings and dispositional order in the present appeal from the subsequent 12-month review hearing findings and orders.

## III.

Mother additionally contends that there was insufficient evidence of a substantial risk of detriment to A.G. if returned to her care at the 12-month review hearing. She emphasizes that she had appropriate housing, substantially complied with her case plan, received positive reviews from her parenting instructor, regularly visited with A.G., and

21

was attentive and loving during visits. She maintains that the contrary evidence lacked credibility as coming from biased sources who wanted A.G. to remain with his caregiver. We find substantial evidence supports the juvenile court's order.

The juvenile court must review a dependency matter at least once every six months after removing a child from parental custody like A.G. was here. (§ 366, subd. (a)(1).) At these review hearings, there is a statutory presumption that the child will be returned to parental custody unless the court finds by a preponderance of the evidence that returning the child "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.) The child welfare agency bears the burden of establishing detriment. (*Cynthia D.*, at p. 249.) In determining whether sufficient evidence supports the juvenile court's order to maintain A.G. in an out-of-home placement, we review the whole record in the light most favorable to the court's decision to determine whether it discloses substantial evidence— that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find that returning A.G. to mother's care posed a substantial risk of detriment to his well-being. (*L.C. v. Superior Court* (2024) 98 Cal.App.5th 1021, 1033-1034.)

Having reviewed the record, we conclude the juvenile court reasonably found the Sacramento Department met its burden to show, by a preponderance of the evidence, that returning A.G. to mother's care at the 12-month review hearing would create a substantial risk of detriment to him. The 12-month review report, which the juvenile court read and considered, contained detailed information demonstrating that A.G. would be at "high risk" if returned to mother's care, including her ongoing and untreated mental health issues, her inability to remain medication-compliant for sustained periods of time, and her minimal progress in resolving the issues that led to A.G.'s removal. One month before the 12-month review hearing, mother's therapist reported to the social worker that

22

mother was not consistent in meeting with the therapist or taking her medication. The therapist referred mother to psychiatry in October 2024, but mother never responded to attempts to schedule an appointment. Mother continued to show distrust, paranoia, and dysregulation during therapy sessions.

During visits with A.G., mother "present[ed] with severe mental health challenges that impact[ed] her ability to fully engage" with A.G. According to the visit supervisor, mother exhibited "significant anxiety, particularly when the baby crie[d] or ma[de] sudden movements." The worker reported that mother's "paranoia fluctuat[ed] unpredictably, often resembling a light switch being turned on and off, which can be alarming." Mother accused A.G.'s caregiver and Solano County child protective services of being in a cult and trying to recruit A.G. into the cult. She often brought unknown persons to her visits who acted "outlandish[ly]" and had "to be escorted out by security." She expressed ongoing fears about her safety, including that an unidentified woman was stalking her and would harm her and A.G. if she found out where mother lived, but provided no proof.

Further, despite receiving a year of reunification services and completing parenting classes, mother "continue[d] to have trouble understanding [A.G.'s] behavioral cues and often [sought] assistance during visits from the caregiver and the visitation staff." Mother's bond with A.G. was underdeveloped as she struggled with basic caregiving tasks such as changing, feeding, playing, and interpreting his cues. A.G.'s caregiver also reported that he was often tense and clingy after visits with mother, which was unusual compared to his normal behavior on non-visit days. In the visit supervisor's opinion, it was important to maintain supervised visits at a CPS location to control the environment, minimize mother's distractions, provide structure, and allow for additional guidance and support from the visit supervisor.

23

Based on the totality of this evidence, the juvenile court could reasonably conclude that A.G. would be at a substantial risk of harm if returned to mother's care at the 12-month review hearing.

IV.

Last, mother seeks reversal on the ground that no adequate ICWA inquiry was conducted. We find no merit in this claim.

A.

Congress enacted ICWA to protect the best interests of Indian children and to promote the stability and security of Native American tribes. (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1128-1129 (*Dezi C.*).) An " 'Indian child' " is an unmarried person under 18 years of age who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); accord § 224, subd. (a).) "ICWA establishes minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes." (*Dezi C.*, at p. 1129.)

Under ICWA's state analogue, the California Indian Child Welfare Act, "courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquire whether a child … is or may be an Indian child' in dependency cases. (Welf. & Inst. Code, § 224.2, subd. (a).)" (*Dezi C.*, *supra*, 16 Cal.5th at p. 1125.) "This 'duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child.' " (*Id.* at p. 1132.)

When a child welfare agency "has 'reason to believe' that an Indian child is involved, further inquiry regarding the possible Indian status of the child is required. (§ 224.2, subd. (e); see also [Cal. Rules of Court,] rule 5.481(a)(4).)" (*Dezi C.*, *supra*, 16 Cal.5th at p. 1132, fn. omitted.) There is "reason to believe" when the juvenile court or agency has information suggesting that a child or parent is a member or citizen of a

24

tribe or may be eligible for membership or citizenship in a tribe.  (§ 224.2, subd. (e)(1).)  If the further inquiry results in a reason to know the child is an Indian child, then formal notice under section 224.3 must be provided to the relevant tribes.  (See § 224.2, subd. (d); *In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

If the juvenile court "makes a finding that proper and adequate further inquiry and due diligence as required in [section 224.2] have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding" that ICWA "does not apply to the proceedings," and that finding is "subject to reversal based on sufficiency of the evidence."  (§ 224.2, subd. (i)(2).)  The juvenile court's "fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review."  (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141.)

Mother asks us to reverse the juvenile court's orders at the 12-month review hearing, as well as prior adverse orders, on the basis of improper ICWA findings.  This claim is not well taken because the juvenile court did not make an ICWA finding at the 12-month review hearing.  To the contrary, at the 12-month review hearing, the court set an ICWA compliance and progress report hearing for April 2025 at which the parties and juvenile court would address the issue.

Mother does not contend that the juvenile court was required to make an ICWA finding at the 12-month review hearing, but claims that the Solano Department's notice to the BIA and Native American tribes the year before was "sorely deficient" and that the Solano juvenile court erred in finding at the November 2024 six-month review hearing (prior to transfer) that ICWA did not apply.  These contentions provide no basis for reversal because, as set forth in detail above, the Sacramento Department's and Sacramento juvenile court's ICWA inquiries continued after the six-month review and transfer and were ongoing at the time of the 12-month review hearing.  For example, the record shows that the Sacramento juvenile court asked mother about possible Native

American ancestry at the initial transfer-in hearing on November 18, 2024. The Sacramento Department investigated her new claim that a paternal relative, perhaps a paternal uncle or her father's cousin named Richard, once told her she had Navajo ancestry. The Sacramento Department subsequently prepared two ICWA compliance reports, noting that mother was unable to provide contact information for the maternal grandfather or the alleged uncle or cousin and documenting its further inquiry efforts. The social worker located addresses for the maternal grandmother and maternal grandfather and sent them each ICWA inquiry letters and sent the tribes an updated family tree. At the Sacramento Department's request, the juvenile court continued the ICWA determination several times to await responses from the maternal relatives to its ICWA inquiry letters and from the tribes based on the updated familial information provided. In January 2025, the social worker called and left detailed messages for the tribes but did not receive a response.

Given the Sacramento Department's ongoing efforts to fulfill its "affirmative and continuing duty" to inquire whether A.G. was an Indian child (§ 224.2, subd. (a)) by the time of the 12-month review and the Sacramento juvenile court's decision to further consider the issue at a later hearing, mother's current ICWA contentions are premature. (*In re M.R.* (2017) 7 Cal.App.5th 886, 904 [declining "invitation to assess the adequacy of an ICWA noticing process that is, as best we can determine from the record in this appeal, still ongoing"].)

## DISPOSITION

The juvenile court's orders are affirmed.

/s/
FEINBERG, J.

We concur:

/s/
ROBIE, Acting P. J.

/s/
BOULWARE EURIE, J.